**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

STARSTONE SPECIALTY INSURANCE
COMPANY,

               Plaintiff,

v.

INFINITY SOLUTIONS, INC.; FLATIRON
DRAGADOS,

               Defendants.

Case No.: 1:25-cv-04105

## COMPLAINT FOR DECLARATORY JUDGMENT

COMES NOW Defendant StarStone Specialty Insurance Company ("StarStone"), by and through its undersigned counsel, and for its Complaint for Declaratory Judgment, seeking a declaration that StarStone has complied with its rights and obligations under the insurance contract at issue and in support thereof, states as follows:

**I.      INTRODUCTION**

1.      StarStone seeks a declaration with respect to the parties' rights and obligations under the CorePro Architects & Engineers Professional Liability Insurance Policy, No. MEO00331404P-00, issued to Infinity Solutions, Inc. ("Infinity"), for the period from February 15, 2025 to February 15, 2026 (hereafter, the "Policy"). *A true and accurate copy of the Policy is attached hereto as Exhibit A.*

2.    This insurance coverage dispute arises out of design and installation work performed by Infinity for Flatiron Dragados ("Flatiron") on the Taxiway DS East and Deicing Pad Project at the Denver Airport (hereafter, the "Project") which reportedly did not strictly adhere to the Project designs such that Flatiron asserts Infinity is liable for an estimated $850,000 to remove and replace the work plus unspecified operational and management costs.

## II.    JURISDICTION

3.    This is an action brought pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, for determination with respect the parties' rights and obligations under the Policy.

4.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.    An actual and justiciable controversy exists with respect to whether there is any duty to defend or indemnify Infinity under the Policy.

6.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in Denver County, Colorado.

## III.    THE PARTIES

7.    StarStone is a foreign insurance corporation incorporated under Delaware law, with its principal place of business in Cincinnati, Ohio.

8.    Infinity is a corporation duly organized and existing under the laws of the State of Colorado with its principal place of business located in Northglenn, Colorado.

9.    Flatiron Dragados is a construction company with its principal place of business located in Broomfield, Colorado. Flatiron Dragados is named solely in its capacity as a potential

2

necessary party with respect to the coverage dispute between StarStone and Infinity under the

Policy.

**IV.    FACTUAL BACKGROUND**

        **A.    <u>The Policy</u>**

        10.    On February 12, 2025, Infinity's President, Joe Jiminez, signed a Certification of

No Known and Unreported Claims or Incidents (hereafter, the "Warranty") stating as follows on

behalf of Infinity:

> I, the undersigned, certify that I have no knowledge of any claims, legal, or
> otherwise, which have been or may be made, against any entity or individual for
> which insurance is requested, which has not been reported previously to you or
> another insurance company. In addition, after making reasonable inquiries, I am
> not aware of any act, error or omission, or allegations of any act, error or omission,
> or any other circumstances or incidents which could give rise to a claim as a result
> of the company's operations or any individual's activities on behalf of the company.
>
> I understand that the insurance company's willingness to provide coverage is based
> on the understanding that there are no known unreported claims or incidents. I also
> understand that all such unreported claims or incidents which later result in claim
> will not be covered by the company's policy.

*A true and accurate copy of the Warranty is attached hereto as <u>Exhibit B</u>.*

        11.    Upon receipt of the Warranty, StarStone issued the Policy to Infinity for the period

of February 15, 2025 to February 15, 2025. *See* Ex. A at Pg. 6.

        12.    The Policy provides coverage subject to the following relevant terms and

provisions:

> **In consideration of the payment of the premium, and in reliance on all statements made
> and information furnished to the Insurer, and subject to all of the terms and conditions of
> this policy (including all endorsements hereto), the Insurer agrees with the Insured to
> provide insurance as stated in this policy.**

**SECTION I - COVERAGES**

**1.    Professional Liability**

The Insurer agrees to pay on behalf of the Insured all amounts in excess of the Deductible and up  to the Limit of Liability that the Insured becomes legally obligated to pay as Damages and Defense  Costs resulting from a Claim first made and reported in writing during the Policy Period or Extended Reporting Period, if applicable, arising out of a Wrongful Act committed before the end of  the Policy Period and on or after the Retroactive Date, if any, shown in the Declarations.

*      *      *

## SECTION III. – DEFINITIONS

**B.**     **Claim** means any of the following arising from a Wrongful Act:
1.     a written demand received by any Insured for monetary, non-monetary or injunctive relief,  including a written demand that the Insured toll or waive a statute of limitations;
2.     a civil proceeding against any Insured commenced by the service of a complaint or similar  pleading;
3.     the institution of an arbitration, mediation, or other alternate dispute resolution proceeding  against any Insured; or
4.     a Privacy Breach Claim;
5.     a Security Event Claim; or 6. a Social Engineering Incident Claim.

*   *   *

**F.**     **Damages** means a monetary judgment or settlement that an Insured becomes legally obligated to  pay as a result of a covered Claim, including punitive or exemplary damages where insurable under  applicable law.
1.     Damages include:
   a.     pre and post judgement interest on the entire amount of any judgment which accrues after the  entry of the judgment and before the Insurer has paid or tendered or deposited in the Court that  part of the judgment that does not exceed the policy limit.
   b.     as regards coverage provided under SECTION I – COVERAGES, A. Insuring Agreement .2. Pollution  Liability, Damages includes Cleanup Costs for which the Insured becomes legally obligated to pay as  the result of a Claim to which this insurance applies.
**2.**     Damages do not include:
   **a.**     any fines, penalties, taxes or sanctions, whether imposed by law or otherwise or liquidated  damages;
   **b.**     the return, reduction or restitution of fees, costs, or expenses;
   **c.**     amounts which are uninsurable under applicable law;
   **d.**     the cost of complying with any injunctive, declaratory, administrative, or other non-monetary  relief;
   **e.**     fees, costs, and expenses paid, incurred, or charged by the Insured, no matter whether  claimed as a restitution of specific funds, financial loss, mitigation expenses, or other non-cash  consideration;

4

  f. amounts paid or incurred by the Insured to replace, restore, or recreate the Insured's  electronic data, computer software, computer hardware, or computer network;

  **g.** amounts which constitute lost income to the Insured as a result of a Privacy Breach or  Security Event; or

  **h.** amounts paid or incurred by the Insured to inform clients of any Security Event or Privacy  Breach.

**G.** **Defense Costs** means:

  **1.** reasonable and necessary fees, costs and expenses charged by any lawyer consented to or   designated by the Insurer to defend any Insured against a Claim;

  **2.** all other reasonable and necessary fees, costs and expenses resulting from the investigation,  discovery, adjustment, defense, settlement or appeal of a Claim as authorized by the Insurer; and

  **3.** the cost of a bond or appeal bond, required as a result of a Claim, including bonds to  release attachments, but only for bond amounts not exceeding the applicable Limit of Liability;  however, the Insurer has no obligation to apply for, guarantee or furnish any such bond. Defense Costs do not include the remuneration, salaries, overhead, fees or expenses of the Insured,  or any fees or expenses incurred prior to the time that a Claim is first made against any Insured  and reported to the Insurer.

  Defense Costs will be paid first and will reduce, and may exhaust, the  Limits of Liability shown in Items 4 and 5 of the Declarations.

    *  *  *

**S.** **Potential Claim** means:

  **1.** any circumstances which might reasonably be expected to give rise to a Claim being made  against any Insured under the policy; or

  **2.** receipt of notice of a Disciplinary Proceeding.

    *  *  *

**Y.** **Professional Services** mean services and activities performed for others in the Insured's  capacity as:

  **1.** an Architect;

  **2.** an Engineer;

  **3.** a Construction Manager;

  **4.** a Land Surveyor;

    *  *  *

**II.** **Wrongful Act** means any actual or alleged act, error, omission or breach of duty by any  Insured in the rendering of or failure to render Professional Services. Wrongful Act also means an  actual or alleged Personal Injury Offense by any Insured or by anyone for whom the Insured is   legally responsible in the rendering of or failure to render Professional Services.

    *  *  *

**SECTION IV. -- EXCLUSIONS**

This Policy does not apply to any Claim:

**A.** arising out of a Wrongful Act, Privacy Breach, Security Event, Social Engineering Incident, Pollution Incident or Expense Event occurring prior to the effective date of the first Architects & Engineers Professional Liability Insurance Policy issued by the Insurer to the Named Insured and continuously renewed and maintained, if:

    **1.** any Insured gave notice to any prior insurer of any such actual Claim or Potential Claim, Wrongful Act, Privacy Breach, Security Event, Social Engineering Incident, Expense Event or Pollution Incident; or

    **2.** any Insured had a reasonable basis to believe that an Insured had committed a Wrongful Act, violated a disciplinary rule, or engaged in professional misconduct.

*    *    *

**F.** arising out of any actual or alleged liability assumed by any Insured under any written or oral contract or agreement, including, without limitation, any indemnification agreement, express warranties or guarantees provided that this exclusion does not apply to any liability that would have attached to any Insured in the absence of such contract or agreement and that is otherwise covered under the policy.

In a foreign jurisdiction where the Insured's liability to a client is predicated only on contractual liability, this Exclusion does not apply except to the extent that the Insured has agreed to pay consequential or liquidated damages.

*    *    *

**SECTION VI. -- CONDITIONS**

**A.** **Defense, Settlement and Cooperation**

    **1.** The Insurer has the right and duty to defend any Insured against any Claim seeking Damages to which this insurance applies even if the allegations of such Claim are groundless, false or fraudulent. The Insurer will designate, or, at the Insurer's sole discretion, approve counsel chosen by the Insured to defend the Claim.

*    *    *

    **3.** The Insured will not, except at the Insured's own cost, make any payment, admit any liability, settle any Claim, assume any obligation or incur any expense, without the Insurer's prior written consent, such consent not to be unreasonably withheld.

*    *    *

**B.** **Reporting and Notice**

    **1.** **Reporting of Claims**

6

If, during the Policy Period or any Extended Reporting Period, any Claim for a Wrongful Act is first made against any Insured, as a condition precedent to the Insured's right to coverage under this policy, the Insured must give the Insurer written notice of such Claim as soon as practicable, but in no event later than the later of 60 days after the expiration date or earlier termination date of this policy, or the expiration of any Extended Reporting Period, if applicable. Timely and sufficient notice of a Claim by one Insured will be deemed timely and sufficient notice for all of the Insureds involved in the Claim. Such notice must give full particulars of the Claim, including, but not limited to: a description of the Claim and Wrongful Act; the identity of the Insured and all potential claimants involved; a description of the injury or damages that resulted from such Wrongful Act; information on the time, place and nature of the Wrongful Act; and the manner in which the Insured first became aware of the Claim.

**2.     Reporting of Potential Claims**

If, during the Policy Period, any Insured first becomes aware of any Potential Claim, the Insured will give the Insurer written notice of such Potential Claim with soon as practicable thereafter, but in any event before the end of the Policy Period. If such Potential Claim later becomes a Claim not otherwise excluded by this policy, such Claim will be treated as if the Claim had been first made during the Policy Period. Full particulars shall include, but are not limited to: a description of the Potential Claim; the identity of the Insured and of all potential claimants involved; information on the time, place and nature of the Potential Claim; the manner in which the Insured first became aware of such Potential Claim; and the reasons the Insured believes the Potential Claim is likely to result in a Claim.

\*     \*     \*

**C.     Multiple Wrongful Acts, Claims or Claimants**

Two or more Claims arising out of a single Wrongful Act, or any series of related Wrongful Acts, will be considered a single Claim. Each Wrongful Act, in a series of related Wrongful Acts, will be deemed to have occurred on the date of the first such Wrongful Act.

**B.     StarStone's Investigation**

13.     On June 16, 2025, Infinity first submitted notice to StarStone through its agent, regarding allegations that an "electrical ductbank was surveyed and installed in the incorrect location on the DEN Taxiway DS East project" at the Denver International Airport on or about July 1, 2023. *A true and accurate copy of the First Notice of Loss ("FNOL") is attached hereto as* *Exhibit C.*

7

14. The FNOL included a copy of a May 27, 2025 email thread wherein Nathan Drake of Flatiron Dragados (hereafter, "Flatiron") wrote the following to Joe Jimenez (President of Infinity):

As discussed over the phone a few weeks ago, please see the attached notice letter for the electrical duct bank that was surveyed and installed in the incorrect location on the DEN Taxiway DS East project.

Please review and let me know if you have any questions or concerns.

15. The FNOL initially omitted the attachment to the May 27, 2025 email.

16. On June 16, 2025, StarStone requested a copy of the attachment to the May 27, 2025 email.

17. On June 19, 2025, StarStone again requested a copy of the attachment to the May 27, 2025 email at which time Infinity's broker provided a copy of the May 27, 2025 notice letter with enclosures: Exhibit 1 – Ductbank Design Drawings (EL105 and EL106) and Exhibit 2 – Infinity Solutions Email (collectively, the "May Letter").

18. The May Letter stated the following in relevant part:

This letter formally addresses a significant issue regarding the electrical ductbank installation for the DEN Taxiway DS East and Deicing Pad project.
The as-built survey has confirmed that the ductbank was installed in an incorrect location, deviating from the design specifications outlined in drawings EL105 and EL106 (Exhibit 1).
Preliminary information (per attached Exhibit 2 Email) suggests this discrepancy may stem from a translation error, for which Infinity Solutions would be responsible.
Following discussions with DEN, the agreed-upon resolution is to install the ductbank in its correct, planned location. This remedial action will require:
· Removal of approximately 40 PCCP panels.
· Proper installation of the ductbank.
· Subsequent reconstruction of the removed panels.
Significant costs are anticipated for this corrective work.
In accordance with Contract Article 9, which mandates that the Service Provider indemnify the Contractor for costs arising from the Service Provider's

8

performance, Infinity Solutions may be held responsible for the expenses associated with this remedial work. Flatiron intends to proceed with performing or subcontracting the necessary work to rectify this issue promptly.

19.     The May Letter specifically incorporates an email dated February 7, 2025 as Exhibit 2 wherein Infinity Project Manager, Gary Algien, wrote to Nathan Drake of Flatiron Dragados as follows:

> After reviewing the stakeout, as-builts, and design files we've concluded there was a translation issue that occurred when linework was taken from the CAD design file (2024.05.13 - Light Layout DN.DS-Rev1) and exported into another program used for stakeout.

20.     In further discussions on June 23, 2025, Infinity explained to StarStone that it provided the as-builts to the airport in February 2025 at which time it was informed that the coordinates did not match up which, after further investigation, Infinity's February 7, 2024 email confirmed because "the west end is nine feet off."

21.     According to Infinity, Flatiron advised they would figure out the best way to fix the error which it subsequently learned in the May Letter was estimated to cost between $300,000 and $800,000.

22.     On July 15, 2025, StarStone issued its initial coverage position letter wherein it explained that the May Letter did not constitute a Claim as defined by the Policy and even if a Claim were ultimately made against Infinity, other terms, provisions and exclusions would prevent any coverage for the matter. *A true and accurate copy of the July 15, 2025 Coverage Position Letter (the "July Letter") is attached hereto as* <u>*Exhibit D*</u>.

23.     In response to the July Letter, Infinity, through its agent, disputed StarStone's coverage determination contending that the Policy should afford coverage for this matter because Infinity did not have knowledge of a potential claim until its receipt of the May Letter.

9

24.    On August 7, 2025, StarStone issued its supplemental coverage position letter reiterating Infinity's representations in the Warranty that it had "no knowledge of any claims, legal, or otherwise" <u>and</u> after making reasonable inquiries, that Infinity was "not aware of any act, error or omission, or allegations of any act, error or omission, or any other circumstances or incidents which could give rise to a claim as a result of the company's operations or any individual's activities on behalf of the company." *A true and accurate copy of the August Letter is attached hereto as <u>Exhibit E.</u>*

25.    By further response dated November 18, 2025, Infinity again disputed StarStone's position and enclosed a copy of correspondence issued by Flatiron on or about October 21, 2025 (collectively, the "November Letter") wherein it stated as follows:

> Please allow this letter to serve as a follow-up to our previous correspondence of May 27, 2025, and as formal notice of a claim arising out of Infinity Solutions' defective survey of the DEN Taxiway conduit.
> Specifically, as you are aware, an as-built survey confirmed that the conduit was installed in an incorrect location, deviating from the design specifications outlined in the pertinent drawings (EL 105 and EL 106). DEN is demanding the cost of relocation, a loss, which is estimated to be at an approximate cost of $850,000 plus any additional DEN operational and/or management costs.
> While our investigation of this issue is ongoing, based on the information obtained to date, this discrepancy results from a translation error, for which Infinity Solutions would be responsible pursuant to its Scope of Work in the Contract. Article 9 of the Contract requires Infinity Solutions to indemnify Flatiron Dragados for all costs associated with its professional negligence. Accordingly, Flatiron Dragados demands that Infinity Solutions indemnify it for any and all costs associated with the loss.
>
> Please confirm that you have informed your attorneys of this situation, and that you have notified all appropriate liability insurance carriers. Please also respond to this demand within 30 days with your position regarding your responsibility and next steps. Flatiron Dragados remains committed to resolving this matter cooperatively but must ensure that its contractual obligations to DEN are satisfied.

*A true and accurate copy of the November Letter is attached hereto as <u>Exhibit F</u>.*

26.     On December 5, 2025[1], StarStone issued its supplemental coverage position letter wherein it formally acknowledged receipt of the November Notice and requested clarification with respect to whether Infinity was seeking defense counsel to assist in responding to the November Notice while continuing to reserve its rights under the Policy and applicable law.

## FIRST CAUSE OF ACTION

### (Declaratory Judgment: Breach of Warranty)

27.     StarStone incorporates by reference Paragraphs 1 through 26 of this Complaint as though fully set forth herein.

28.     On or before February 7, 2025, Infinity first recognized a nine-foot discrepancy in the as-builts submitted to the Airport which it attributed to "a translation issue that occurred when linework was taken from the CAD design file (2024.05.13 - Light Layout DN.DS-Rev1) and exported into another program used for stakeout."

29.     On February 12, 2025, Infinity executed the Warranty wherein it certified that it had "no knowledge of any claims, legal, or otherwise" and that after making reasonable inquiries, Infinity was "not aware of any act, error or omission, or allegations of any act, error or omission, or any other circumstances or incidents which could give rise to a claim as a result of the company's operations or any individual's activities on behalf of the company."

30.     By executing the Warranty, Infinity also acknowledged that StarStone's "willingness to provide coverage is based on the understanding that there are no known unreported

---

[1] Pursuant to the parties' agreement to extend the deadline to respond to the November Letter (and October 21, 2025 letter) by fourteen (14) days.

claims or incidents" and certified its understanding "that all such unreported claims or incidents which later result in claim will not be covered by the company's policy. *See* Ex. B.

31.     The Policy expressly states it is issued "[i]n reliance on all statements made and information furnished to the Insurer, and subject to all of the terms and conditions of this policy (including all endorsements hereto)[.]" *See* Ex. A, Pg. 9.

32.     The May Letter describes the "significant issue regarding the electrical ductbank installation for the DEN Taxiway DS East and Deicing Pad project" with specific reference to the February 7, 2025 email which "suggests this discrepancy may stem from a translation error, for which Infinity Solutions would be responsible."

33.     The February 7, 2025 email demonstrates that Infinity was aware of an act, error or omission, or allegations of an act, error or omission or any other circumstances or incidents which could give rise to a claim as a result of the company's operations or any individual's activities on behalf of the company.

34.     Any claim involving the circumstances in the May Notice and related correspondence subsequently issued by the parties is barred from coverage under the Policy by virtue of the Warranty.

WHEREFORE, StarStone seeks a declaration that there is no coverage for the matters at issue in the May and November Notices due to Infinity's breach of the Warranty executed on February 12, 2025.

## SECOND CAUSE OF ACTION

**(Declaratory Judgment: In the Alternative, Exclusion A.2. Applies)**

12

35.     StarStone incorporates by reference Paragraphs 1 through 34 of this Complaint as though fully set forth herein.

36.     The Policy's Professional Liability Insuring Agreement provides coverage for **Damages** and **Defense Costs** resulting from a **Claim** first made and reported in writing during the **Policy Period** arising out of a **Wrongful Act** committed before the end of the **Policy Period** and on or after the **Retroactive Date.**

37.     **Wrongful Act** means any actual or alleged act, error, omission or breach of duty by any **Insured** in the rendering of or failure to render **Professional Services**.

38.     **Professional Services** means services and activities performed for others in the **Insured's** capacity as an Architect, Engineer, Construction Manager, Land Surveyor, and **Technology Services,** among others.

39.     The May Letter reported that "[t]he as-built survey has confirmed that the ductbank was installed in an incorrect location, deviating from the design specifications" and asserted "this discrepancy may stem from a translation error, for which Infinity Solutions would be responsible."

40.     The May Letter appears to assert Wrongful Acts within the meaning of the Policy.

41.     The May Letter reported remedial action *would be* required and that "significant costs are *anticipated* for this corrective work." (emphasis added).

42.     The May Letter concluded that "Infinity *may* be held responsible for the expenses associated with this remedial work." (emphasis added).

43.     The May Letter did not seek any monetary, non-monetary or injunctive relief from Infinity at that time.

44. The November Letter reported that "*DEN* is demanding the cost of relocation, a loss, which is *estimated* to be at an approximate cost of $850,000 *plus any additional DEN operational and/or management costs*." (emphases added).

45. The November Letter further provides Flatiron's "demands that Infinity Solutions indemnify it for any and all costs associated with the loss" but does not specify the monetary amount sought.

46. The November Letter instead requests that Infinity: (A) confirm that it has informed its attorneys of the situation; (B) confirm that Infinity has notified all appropriate liability insurance carriers; and (c) respond within 30 days with Infinity's position regarding its responsibility and next steps.

47. To the extent November Letter seeks nonmonetary or injunctive relief, it would qualify as a Claim under the terms of the Policy.

48. To the extent the November Letter satisfies the requirements of the Policy's Professional Liability Insuring Agreement, Exclusion A.2. precludes coverage for any Claim arising out of a Wrongful Act occurring prior to the effective date of the first Architects & Engineers Professional Liability Insurance Policy issued by StarStone to Infinity and continuously renewed and maintained, if any Insured had a reasonable basis to believe that an Insured had committed a Wrongful Act, violated a disciplinary rule, or engaged in professional misconduct.

49. The effective date of the first Architects & Engineers Professional Liability Insurance Policy was February 15, 2025.

50. Based on the February 7, 2025 Email, Infinity had a reasonable basis to believe that an Insured had committed a Wrongful Act prior to the effective date of the first Architects & Engineers Professional Liability Insurance Policy.

51. Exclusion A.2. would apply as an absolute bar to coverage for this matter.

WHEREFORE, in the alternative, StarStone seeks a declaration that it does not owe any duty to defend or indemnify Infinity under the Policy because Exclusion A.2. would preclude any coverage to the extent the requirements of the Policy's Professional Liability Insuring Agreement were satisfied.

## THIRD CAUSE OF ACTION

### (Declaratory Judgment: In the Alternative, Exclusion F. Applies)

52. StarStone incorporates by reference Paragraphs 1 through 51 of this Complaint as though fully set forth herein.

53. To the extent the requirements of the Policy's Professional Liability Insuring Agreement were satisfied, Exclusion F. precludes coverage for any Claim arising out of any actual or alleged liability assumed by any Insured under any written or oral contract or agreement, including, without limitation, any indemnification agreement, express warranties or guarantees.

54. Exclusion F. does not apply to any liability that would have attached to any Insured in the absence of such contract or agreement and that is otherwise covered under the policy.

55. In the May Letter, Flatiron states, "[i]n accordance with Contract Article 9, which mandates that the Service Provider indemnify the Contractor for costs arising from the Service Provider's performance, Infinity Solutions may be held responsible for the expenses associated with this remedial work."

15

56.    In the November Letter, Flatiron further states that it "remains committed to resolving this matter cooperatively but must ensure that its contractual obligations to DEN are satisfied."

57.    To the extent the requirements of the Professional Liability Insuring Agreement were satisfied, Exclusion F. would preclude any coverage for liability assumed by Infinity under Contract Article 9 of its agreement with Flatiron.

58.    Likewise, Exclusion F. would preclude any coverage for any obligations assumed by Infinity with respect to Flatiron's contract with DEN.

WHEREFORE, StarStone seeks a declaration Exclusion F. would preclude any coverage for Infinity with respect to Flatiron's claims in the May Letter and November Letter.

## PRAYER FOR RELIEF

WHEREFORE, StarStone respectfully requests that this Court enter a declaratory judgment finding:

(a)    The Policy does not apply to the issues raised by Flatiron in the May and November Letters because Infinity has breached the Warranty which is expressly incorporated into the Policy.

(b)    In the alternative, to the extent the requirements of the Professional Liability Insuring Agreement were satisfied:

(1)    Exclusion A.2. applies as an absolute bar to coverage under the Policy; and/or

(2)    Exclusion F. applies as an absolute bar to coverage under the Policy.

16

Dated:  December 22, 2025

Respectfully submitted,

/s/ *Joseph E. Okon*___

Gary L. Gassman (*pro hac vice forthcoming)*
Abigail C. Kanavos (*pro hac vice forthcoming*)
Cozen O'Connor
123 N Wacker Drive - Suite 1800
Chicago, IL 60606
312-474-7130
Email: ggassman@cozen.com
Email: akanavos@cozen.com

Joseph E. Okon
Cozen O'Connor
707 17th St., Suite 3100
Denver, CO  80202
Phone: (720) 479-3900
jokon@cozen.com
*Attorneys for Defendant StarStone Specialty Insurance Company*